DAVID B. BARLOW, United States Attorney (#13117)
TYLER L. MURRAY, Assistant United States Attorney (#10308)
Attorneys for the United States of America
185 South State Street, Suite 300, Salt Lake City, Utah 84111
Tel: (801) 524-5682 ◆ Fax (801) 325-3310



IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, CENTRAL DIVISION

| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>$84,974.00 in U.S. Currency,<br><br>Defendant. | VERIFIED COMPLAINT FOR FORFEITURE *IN REM*<br><br>Case: 2:13-cv-00358<br>Assigned To : Waddoups, Clark<br>Assign. Date : 5/20/2013<br>Description: USA v. $84,974 |
|---|---|

In this in rem forfeiture action, the United States alleges:

### NATURE OF THE ACTION

1. This is a judicial forfeiture action, under 21 U.S.C. § 881(a)(6). The defendant currency was seized in connection with the distribution of controlled substances in violation of 21 U.S.C. § 841(a)(1).

### THE DEFENDANTS IN REM

2. The defendant property consists of $84,974.00 in U.S. Currency. The $84,974.00 in U.S. Currency is presently in the custody of the United States Marshals Service.

### JURISDICTION AND VENUE

3. This Court has subject matter jurisdiction over this matter under 28 U.S.C. §§ 1345 and 1355(a) and in rem jurisdiction is proper under 28 U.S.C. §§ 1355(b).

Page **1** of 9

Moore

4.     Venue in this Court is proper under 28 U.S.C. §§ 1391 and 1395 because the defendant was seized in the District of Utah.

5.     This action is timely filed in accordance with 18 U.S.C. § 983(a)(3)(A).

## PARTIES

6.     Plaintiff is the United States of America.

7.     Defendant is $84,974.00 in U.S. Currency.

## FACTUAL BACKGROUND

### The Investigation

8. On or about December 23, 2012, Special Agent Arthur Street ("SA Street") received a telephone call from the New York Drug Enforcement Administration ("NY DEA") informing SA Street that a passenger named Jon Moore ("Moore") boarded an airplane heading for Salt Lake City, Utah. According to NY DEA, Moore was transporting a large amount of cash concealed in the lining of his luggage.

9. After the airplane landed in Salt Lake City, Utah, SA Street approached Moore while he was exiting the concourse. SA Street asked Moore if they could talk in an office by the TSA security checkpoint. Moore agreed and they walked together to the office.

10. While walking to the office, SA Street asked Moore questions about his flight. Moore told SA Street that he usually purchased his travel tickets the same day he travels. Moore told SA Street that he lived in Las Vegas, Nevada, but was traveling to Park City, Utah, to visit his parents.

### The Interview

11. SA Street asked Moore if there were any drugs or weapons in his luggage. Moore answered "No." SA Street asked Moore if he had any large quantities of money in his luggage. Moore responded, "What do you consider a large amount?" SA Street asked Moore, "What do you consider a large amount of money?" Moore did not reply. SA Street asked Moore if he used drugs. Moore said he didn't know anything about drugs.

12. SA Street informed Moore that he wanted to discuss the large sum of money in Moore's luggage. Moore said he was carrying the money, which was separate from an inheritance he had received, and because he did not want his father to know he had the money. He also said he was carrying the money in his luggage because he did not want his girlfriend to steal the money from his bank accounts.

13. Moore told SA Street he could show him where he had withdrawn the money from his bank account. Moore removed a mini iPad and opened his bank statement that showed withdrawals in the amounts of approximately $9,500 each time.

14. SA Street asked again if there were any drugs in Moore's luggage. Moore again denied possessing any drugs. SA Street informed Moore that he suspected the money was not from a legitimate source, because Moore was extremely nervous, the bank deposits and withdrawals had been structured to avoid the cash reporting requirements, Moore's admitted last minute travel itineraries and Moore's responses to simple questions, in which Moore would repeat the question to gain additional time to develop a response. SA Street informed Moore that he was going to have a drug detection dog sniff the luggage.

**The Drug Dog**

15. Task Force Officer Brandon Shearer ("TFO Shearer") and his certified drug detection dog, Jet, were on the scene. (SA Street had previously requested their presence in case the need arose.)

16. TFO Shearer also asked five volunteers passing through the TSA security check point to place their luggage on the ground. SA Street randomly placed Moore's luggage with the other five bags. TFO Shearer then deployed Jet to sniff the luggage.

17. Jet alerted to Moore's luggage, but did not alert to any of the other five bags. As Jet alerted to Moore's luggage, he made the statement, "Some of my friends in New York smoke marijuana," contradicting Moore's earlier statement he knew nothing about drugs.

**The Search**

18. Based on the K-9 alert to Moore's luggage, SA Street conducted a search of the bag for controlled substances. SA Street located four Mylar bags in the lining portion of the luggage, along with two cellular telephones. SA Street also located a bag containing elastic bands, five unused Mylar bags, and a hard drive.

19. All of the items were seized. While obtaining an address for Moore, he informed SA Street that he did not live in Las Vegas, Nevada, but with his parents in Park City, Utah. Moore said that he lied about living in Las Vegas.

20. SA Street then moved the money to a clean locker near the TSA security checkpoint and closed the door. SA Street then directed TFO Shearer to have Jet sniff the locker area. Jet

alerted to the locker where the money had been concealed, but not to any of the other lockers in the same area.

21. After Jet alerted the second time to the money, SA Street asked Moore for his driver's license to verify his identity. As Moore opened a satchel type briefcase, TFO Shearer observed additional Mylar bags in the satchel. SA Street then conducted a search of the satchel and seized two additional Mylar bags containing money.

22. SA Street then conducted a pat down search of Moore and discovered five additional cellular telephones on his person. Additionally, SA Street located documents consistent with pay-owe sheets (drug ledgers) and transportation routes across the United States.

**Follow-up Interview**

23. After SA Street located the money, packaging, cellular telephones, and drug ledgers, Moore agreed to go to the DEA office to discuss the origin of the money. Before going to the DEA office, Moore said he was a "money guy" for the Mexican cartels.

24. After arriving at the DEA office, Moore was advised that he was not under arrest, and was free to leave if he desired. Moore said he wanted to discuss the situation.

25. Moore said in March of 2012, he was introduced to a man named Joe by a man named Justin. Moore said that he did not know Joe or Justin's last names, but he had the information at home in Park City. (SA Street and Moore later traveled to Moore's parent's home in Park City. After a subsequent consent search of Moore's room at his parent's house, a document from the Internal Revenue Service showed that Joe's last name is Schiliro).

26. Moore indicated that Schiliro was connected with the "Mexican cartel members." Moore said he was introduced to a man named "P" by Schiliro. P is a source of supply for marijuana for Schiliro and others in the New York area.

27. SA Street asked Moore about the documents that were found in his luggage. Moore stated that the map was a listing of cities across the country and the mileage between different paired cities. On one of the other sheets, was a list of money that Schiliro and P wanted Moore to transport from New York to Las Vegas. On the back of this document was a list of cities into which Schiliro and P wanted to expand their marijuana distribution business.

28. Moore stated the first money he received from Schiliro was approximately $75,000 which he received in New York at Schiliro's residence. Moore estimated that Schiliro sold approximately 50 pounds of marijuana per month.

29. Moore stated that he would pick up money that he received from Schiliro and transport it to Las Vegas. Moore would deposit the money into his Nevada bank accounts. Moore explained that the customers would pay in small denomination bills, and Moore would change the small bills into larger denomination bills. Moore would fly the large bills back to New York and return them to Schiliro. He would receive between 5%-7% commission, plus expenses.

30. SA Street asked Moore if he had any additional money at his residence. Moore stated that there may be $10,000 more at his house. Moore agreed to a consent search of his living area at the residence in Park City, Utah.

31. While at the Park City home, Moore led the officers to the basement to his bedroom. SA Street seized two documents from the home: the previously mentioned IRS document on Schiliro, and a blank prescription. No additional currency was located or seized at this residence.

**Totality of Circumstances**

28. Based on the circumstances under which the Defendant was found including (i) the dog alert on the luggage and the money; (ii) the packaging of the money in Mylar bags; (iii) the multiple cellular telephones; (iv) the maps for cross country travel for Moore to solicit more business for selling narcotics; and (v) the admissions of Moore, the defendant $84,974.00 in U.S. Currency was generated in connection with the distribution of controlled substances.

## COUNT I

### 21 U.S.C. § 881(a)(6)
### (Forfeiture of monies facilitating and proceeds of drug distribution)

29. The United States reasserts all allegations previously made.

30. 21 U.S.C. § 881(a)(6) provides for the forfeiture of all money furnished or intended to be furnished by any person in exchange for illegal drugs, all proceeds traceable to such an exchange, and all money used or intended to be used to facilitate such an exchange.

31. As set forth above, Defendant $84,974.00 in U.S. Currency was used in violation of 21 U.S.C. § 841(a)(1) and is therefore subject to judicial forfeiture under 21 U.S.C. § 881(a)(6).

## REQUEST FOR RELIEF

WHEREFORE, the United States respectfully asserts that the defendant $84,974.00 in U.S. Currency is forfeitable to the United States under 21 U.S.C. § 881(a)(6).

The United States further requests:

A. That, pursuant to the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions, Rule G(3)(b)(I), the Clerk of the Court issue a Summons and Warrant of Arrest *in Rem* as to defendant $84,974.00 in U.S. Currency;

B. That Notice of this action be given to all persons known or thought to have an interest in or right against the U.S. Currency;

C. That the defendant, $84,974.00 in U.S. Currency, be forfeited and condemned to the United States of America;

D. That, after trial, the Court decree, confirm, enforce and order an Order of Forfeiture as to the U.S. Currency to the United States; and order the United States Marshal, or his delegate, to dispose of the U.S. Currency as provided by law; and

E. Award Plaintiff, the United States its costs of court and all further relief to which it is entitled.

DATED this 20th day of May, 2013.

> DAVID B. BARLOW
> United States Attorney
>
> /s/ Tyler Murray
> TYLER L. MURRAY
> Assistant U.S. Attorney

Moore

## VERIFICATION

I am a Special Agent of the Drug Enforcement Administration (DEA) and have been employed by the DEA since February 1999. In June 1999, I completed an intensive 17-week DEA training academy, in Quantico, VA, which provided me with a background and basis of knowledge relating to the investigation of drug related crimes, including but not limited to, the importation and distribution of controlled substances in violation of Title 21 of the United States Code. I am responsible for the investigation of violations of Federal Criminal Code 21 U.S.C. §841, 21 U.S.C. §846, 21 U.S.C. §881 and State of Utah Criminal Code §58-37 and other laws pertaining to the illegal use and/or trafficking of controlled substances. Since May 2003, I have been and am currently assigned to the DEA/Metro Narcotics Task Force in Salt Lake City where I have been investigating both federal and state narcotics cases.

I have read the contents of the foregoing Complaint for Forfeiture *In Rem* and verify under penalty of perjury pursuant to 28 U.S.C. § 1746 that the statements contained therein are true and correct to the best of my knowledge and belief.

Executed on this 20th day of May, 2013.

ARTHUR STREET, Special Agent
Drug Enforcement Administration

Moore